1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LOUIS YSLAS,                          No.  1:16-cv-00020-JLT (HC)

12              Petitioner,                 **ORDER DENYING PETITION FOR WRIT
                                            OF HABEAS CORPUS**
13        v.
                                            **ORDER DIRECTING CLERK OF COURT
14                                          TO ENTER JUDGMENT AND CLOSE
     DERRAL G. ADAMS, Warden,               CASE**
15
                Respondent.                 **ORDER DECLINING ISSUANCE OF
16                                          CERTIFICATE OF APPEALABILITY**

17

18        Petitioner is currently serving a determinate sentence of 12 years for his conviction of

19   felony child abuse resulting in great bodily injury.  Petitioner has filed the instant habeas action

20   claiming trial court errors, ineffective assistance of counsel  and due to a claimed lack of

21   sufficient evidence to sustain the guilty verdict.  As discussed below, the Court finds the claims to

22   be without merit; therefore, the petition will be **DENIED.**

23   **I.        PROCEDURAL HISTORY**

24        Petitioner was convicted in the Kern County Superior Court on June 5, 2012, of felony

25   child abuse resulting in great bodily injury (Cal. Penal Code §§ 273a(a), 12022.7(d)).  People v.

26   Yslas, No. F065132, 2014 WL 4923991, at *1 (Cal. Ct. App. 2014).  He appealed to the

27   California Court of Appeal, Fifth Appellate District ("Fifth DCA"), which affirmed the judgment

28   on October 1, 2014.  Id.  Petitioner filed a petition for review in the California Supreme Court,

                                              1

and the petition was summarily denied on December 10, 2014. (See Answer, Ex. B.)

On December 1, 2015, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. No. 1). Respondent filed an answer on April 12, 2016. (Doc. No. 12). Petitioner filed a traverse to Respondent's answer on June 28, 2016. (Doc. No. 15.) The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. Nos. 8, 19.)

## II.   FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

Leticia [N.2] Yslas and defendant took their 10–month–old child Nicholas to Ridgecrest Regional Hospital on April 2, 2010. [N.3] Doctors there determined Nicholas was suffering from severe brain swelling and seizures and had to be transported by helicopter to Loma Linda University Children's Hospital. Nicholas underwent extensive treatment for his injuries, including surgery whereby a portion of his skull was removed to allow his brain to swell outside of the cranium. As a result of his injury, Nicholas has profound brain damage. He suffers from cerebral palsy, no longer has the ability to crawl, walk, or swallow, is legally blind, and must be fed through a feeding tube.

> [N.2] To avoid confusion we will refer to Leticia Yslas by her first name. No disrespect is intended.

> [N.3] All further references to dates are to 2010 unless otherwise indicated.

The central issue at trial was the cause of Nicholas's injuries. The prosecution's theory was that defendant was the cause of the injuries, through some sort of rapid acceleration/deceleration force, such as shaking. The defense argued Nicholas was suffering from bacterial meningitis, which caused his brain to swell, resulting in the injuries.

### Prosecution Case

Dr. Katherine Ferguson, Nicholas's pediatrician, testified she had seen the child routinely before his injury. Nicholas was previously diagnosed with Down syndrome but appeared to be high functioning. Dr. Ferguson last examined Nicholas on March 31, two days before his admission to the hospital. At that time he received various vaccinations, including the pneumococcal vaccine, which prevents meningitis and pneumonia. Nicholas did not appear to have any sort of infections, including meningitis.

On the morning of April 2, Leticia was home with defendant, Nicholas, and her two-year-old son Louis Jr. Other than being a little more fussy than usual due to the immunizations he had received two days earlier, Nicholas was acting normally

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

that morning. That afternoon, Leticia left the child at home with defendant and Louis Jr. while she went shopping. She returned about two hours later. She recalled making a phone call to defendant to check on the children while she was out, but she did not attempt to speak to Nicholas on the phone. When she returned, Nicholas was lying on defendant's chest with a blanket covering him and appeared to be sleeping.

Within minutes of Leticia's return home, defendant took Nicholas to his room and put him in his crib for a nap. Defendant then ordered a pizza and the two watched a movie. An hour later, Leticia heard Nicholas making noises in his room. She was going to get him but did not because defendant told her to let him sleep. Sometime later, she again heard Nicholas making noises and went to get him.

Upon entering Nicholas's room, Leticia noticed he was lying on his stomach. When she rolled him over, she saw he was shaking, his head was pulled in, and he was stiff. Additionally, she noticed yellow foamy matter on his bedding. She immediately screamed for defendant to call 911. Defendant told her he would not pay for an ambulance and it would also be faster to just drive to the hospital. They arrived at the Ridgecrest hospital where Nicholas was examined and subsequently airlifted to a hospital in Loma Linda. Upon his arrival there, he was in critical condition.

Leticia drove to Loma Linda while defendant slept. After arriving, the couple checked into the Ronald McDonald House but were asked to leave on the evening of April 3d because Nicholas's injuries were determined to have resulted from child abuse. Additionally, the couple was informed by medical staff at the hospital that his injuries were a result of forced trauma. Defendant was present when this information was relayed.

The following morning, April 4, Leticia and defendant went back to the hospital and spoke to Nicholas's nurse. Leticia overheard defendant asking odd questions. Nicholas's nurse testified defendant asked her questions related to causation of the injury. She thought this was odd as most parents ask about their child's condition or prospects of recovery. Defendant did not ask those types of questions.

That afternoon, Leticia and defendant left the hospital to get something to eat. After lunch, defendant dropped off Leticia at the hospital and said he was going back to the motel to sleep. Defendant never returned to the hospital. That afternoon, Deputy Sheriff Caroline Stallings responded to the hospital to detain defendant. Defendant was not at the hospital when she arrived, nor was he at any nearby lunch locations or at his motel.

Nicholas remained in the hospital until some time after June 1. While at the hospital, he had a craniotomy to remove part of his skull. After being discharged, Nicholas was transferred to a nursing home for medically fragile children. He remained there for five months and then went back to the hospital to have a cranioplasty to reattach the portion of his skull. That occurred on November 12.

At the time of trial, Nicholas was two and a half years old and living with his mother. She described his condition as poor; he suffers from cerebral palsy, he has a gastric feeding tube due to his inability to swallow, he has a seizure disorder and muscle spasms, he is legally blind, and he can neither crawl nor walk.

Detective Ryan Sloan with the Ridgecrest Police Department was assigned to investigate child abuse relating to Nicholas. He was initially unsuccessful in

locating defendant. On April 5, Sloan began following Christopher Avery, a close friend of defendant. Sloan followed Avery, who was driving a rental car, from Ridgecrest to Las Vegas, Nevada. Avery drove to a home where defendant was located and arrested.

After defendant's arrest, Sloan interviewed him. Defendant told the officer he and his wife had initially considered putting Nicholas up for adoption but decided against it. He claimed his wife continued to bring up the idea even after they had decided against it. On the day in question, Leticia went shopping and when she returned defendant had Nicholas lying on his chest. He put Nicholas in his crib shortly after Leticia returned. The two watched a movie and Leticia went to wake the child after about an hour, but defendant convinced her to let him sleep. When Leticia ultimately checked on Nicholas, it appeared he was having a stroke. Defendant immediately drove the family to the hospital. Over the next few days it became clear in the way the doctors, staff, and his wife were acting that defendant was going to be accused of harming Nicholas. Defendant decided to leave because he feared being jailed.

Regarding Nicholas's injuries, defendant denied ever harming him. He stated there was a minor incident where Nicholas fell and bumped his head while Leticia was out, but that was the only incident. Nicholas had been sitting up with defendant when Leticia called. Upon hearing his mother's voice, Nicholas got excited, lunged for the phone, and fell forward hitting his forehead. He cried for a short time while defendant soothed him, and then he fell asleep on defendant's chest. When asked what he thought had happened to Nicholas, defendant stated, "You know I asked my wife [if] she hit him on anything. If she dropped him or anything on accident and she said, 'No.' So, alls... I don't have enough information, man. I have no idea man. I have no idea what happened to my son."

### Medical Testimony

Dr. Mark Massi, a forensic pediatrician at Loma Linda University, specializes in determining whether children are abused. Patients are referred to him by other doctors who suspect abuse. Dr. Massi reviewed all of Nicholas's medical records, communicated with Nicholas's primary care team, and personally examined the child. After reviewing all of the information, Dr. Massi concluded Nicholas had a traumatic brain injury and rib fractures. Nicholas received injuries resulting from a rapid acceleration/deceleration event, which is consistent with shaken baby syndrome or abusive head trauma. There are three characteristics of this type of trauma: brain injury, subdural hemorrhage, and retinal bleeding. Each of these conditions was present in Nicholas. Nicholas suffered a subdural hematoma, retinal hemorrhage in both eyes, and injury to the frontal, parietal, and occipital lobes of his brain. The doctor also noted Nicholas had evidence of a possible healing rib fracture, which would also be indicative of abuse.

In Dr. Massi's opinion, the number one cause of a subdural hematoma is trauma. While an infection of the brain, such as encephalitis or bacterial meningitis, could cause a subdural hematoma, it is unlikely without the presence of an abscess. Nicholas did not have an abscess. Likewise, the type of retinal hemorrhaging present in the child, which occurred in multiple layers of both retinas, indicated a traumatic cause for the bleeding rather than an underlying medical condition. While bacterial meningitis can also cause retinal hemorrhage, the bleeding tends to be in a pattern different from that present in Nicholas. Rather, the hemorrhaging in the child's retinas was consistent with a rapid acceleration/deceleration occurrence.

Furthermore, a rapid acceleration/deceleration event causes a diffuse brain injury as opposed to an injury focused on a certain area. Nicholas's injury affected multiple areas of the brain, indicating it was consistent with acceleration/deceleration. In a situation where the brain is deprived of oxygen—for example, through the formation of a blood clot—then the entire brain will show damage. Here, Nicholas had widespread injury to his brain, indicating a result of acceleration/deceleration. The most severe damage extended from the right frontal lobe to the left parietal lobe. Nicholas's medical records indicated he had a clotting disorder, which increased his risk of forming blood clots. However, Dr. Massi noted the child suffered from a subdural hematoma meaning he was having bleeding, not clotting, in the brain. Furthermore, examination of Nicholas's arteries in his brain did not reveal any sign of a blood clot.

Due to his injury, Nicholas had to have a craniectomy, a procedure where part of the skull is removed to allow the brain to swell and attempt to heal.

X-rays taken on April 3 and repeated on April 28 showed evidence of fractures to Nicholas's left sixth and seventh rib. Doctors did not notice the rib fractures in the earlier X-ray, but upon reexamination they concluded it contained a possible fracture. It is not uncommon for a hairline fracture to be initially difficult to detect, which is why X-rays are later repeated. If there is a fracture, there will be evidence of the healing process in later X-rays. It takes four to six weeks for the healing process. The type of rib fractures suffered by Nicholas usually result from squeezing or compressing the ribs in a front to back motion.

Medical records from when Nicholas was initially brought to the Ridgecrest hospital stated he had no overt signs of infection. Nicholas had an elevated white blood-cell count as well as elevated C-reactive protein and glucose levels, all of which could indicate an infection but were also not uncommon for trauma or inflammation. Various laboratory tests done to determine whether the child ever had an infection of the brain were negative. The tests were performed after antibiotics had been administered, however, the tests showed no indication of bacteria, including bacteria killed from the medication.

There were no obvious signs of trauma to Nicholas's head such as bruising or abrasions. In Dr. Massi's opinion, Nicholas's injuries—including the subdural hemorrhaging, the retinal hemorrhaging, brain injury, and fractured ribs— indicated he suffered nonaccidental trauma. The doctor could not say precisely how the injuries occurred, but they were consistent with a rapid acceleration/deceleration such as violent shaking. Dr. Massi conceded there are a small minority of doctors who do not believe in the concept of shaken baby syndrome.

Nicholas's injuries left him severely brain damaged. Brain tissue does not regenerate and it is unlikely any lost function due to the injury will return after the injury. As a result of his injuries, Nicholas was legally blind, could not swallow, had to be fed through a feeding tube, could not crawl or walk, and suffered from cerebral palsy and seizures.

### Defense case

Defendant testified he lived in Ridgecrest with his wife and two children at the time of Nicholas's injury. He had a form of arthritis affecting his entire body that made it difficult to use his hands. On the day in question, defendant was home alone with his two children while his wife was out doing some shopping. Louis Jr.

5

was napping and Nicholas sat in a jumper chair while defendant was painting a screen door. After he finished painting, defendant played with Nicholas. At one point he received a call from his wife. When he put the phone on speaker, Nicholas reached out to grab the phone and fell over, hitting his head. He cried for a short time but appeared fine, and defendant held him until Nicholas fell asleep.

Leticia arrived home about 15 to 20 minutes later and defendant was still holding Nicholas, getting him to sleep for his nap. While Nicholas was asleep, defendant put him in his crib. Defendant watched a movie with his wife and ordered pizza. Leticia noticed Nicholas had been asleep longer than usual and wanted to check on him, but defendant convinced her to let him sleep. After the movie was over, Leticia checked on Nicholas and began screaming. Defendant ran in and saw the child's arm was stiff and his head was limp. He picked up Nicholas and put him in the carrier to take him to the hospital. Leticia told defendant to call 911 but defendant said he would take them to the hospital because it was so close. While Nicholas was being attended to at the hospital, defendant left to drop off his other son and then returned. Later that night, a police officer arrived and interviewed defendant and his wife separately; defendant told the officer what had happened that day.

Defendant and his wife were informed Nicholas would be airlifted to a hospital in Loma Linda. They decided to drive down there as well. Before they left, officers asked if they could go to defendant's home to take photographs, and defendant agreed. Defendant took a shower while his wife gathered their belongings to take with them to Loma Linda. They arrived at Loma Linda late that night and were up most of the night receiving updates from the doctors. In the morning they checked into the Ronald McDonald House but were asked to leave later that day because the doctors suspected child abuse. Subsequently, defendant felt the staff at the hospital was treating him differently. Defendant checked into a motel with his wife for the night. However, defendant did not get any sleep as the hospital called him every hour to get consent to administer medications.

Defendant woke his wife about 5:00 a.m. the following morning because he had to get some sleep. At this point it was April 4. Leticia came back to the motel about 10:00 a.m. and woke defendant by slamming the door and asking what he did to their son. They went back to the hospital and a social worker wanted to speak with defendant. He said he had "nothing to say to her." Defendant wrote down a series of questions for the doctor because he did not know what had happened to his son. Then he and his wife went to get lunch and he told his wife he was leaving. He took his wife to the bank, got her some money, and dropped her off at the hospital.

Defendant started driving home but Leticia called and put on the social worker, who was rude to him. Thinking the police would be waiting for him at home, defendant decided to go to a friend's house in Las Vegas. Defendant contacted Avery and asked him to bring him clothes and money. Avery also told defendant his grandmother would contact an attorney for him. The next day defendant had contact with an attorney who said he would check into the situation for him. Later that night Avery arrived, followed shortly thereafter by the police who arrested defendant. At the time defendant was arrested, he was not aware there was a warrant out for his arrest. The attorney had told him there were no pending charges. Defendant denied doing anything to injure Nicholas.

Defendant admitted he never called the hospital to get information on his son's condition after he fled. Rather, he claimed he got information regarding Nicholas's condition through other sources.

6

Dr. Steven Gabaeff is a clinical forensic medicine physician. Clinical forensic medicine is the practice of analyzing medical findings as they relate to law. Dr. Gabaeff is familiar with shaken baby syndrome and believes the theory has been disproved. He does not believe a human can shake a baby with enough force to cause severe injuries. Additionally, two of the three characteristics of shaken baby syndrome are subdural hematoma and retinal hemorrhaging, which can have numerous causes.

After reviewing Nicholas's medical records, Dr. Gabaeff opined the child had meningitis when he was seen at the hospital on April 2 and that he had been suffering from it for a few days prior. He believed Nicholas's laboratory results were consistent with infection. He opined the negative test on Nicholas's spinal fluid was useless as the test was taken after the child had received five days of very high-dose antibiotics. He also noted the doctors at both the Ridgecrest and Loma Linda hospitals were treating Nicholas for meningitis.

Due to Nicholas's clotting disorder, he was at a higher risk of developing a blood clot. Furthermore, Dr. Gabaeff believed Nicholas had formed a blood clot in his head that deprived his brain of oxygen, causing massive parts of his brain to die. The way the child's brain tissue died was inconsistent with an occurrence of acceleration/deceleration but consistent with the brain not receiving blood flow due to a blood clot. Dr. Gabaeff believed there was a test that could have been utilized to establish the presence or absence of a blood clot, however, the doctors never performed the test. Moreover, Nicholas showed no sign of any neck injury, which in his mind ruled out any type of shaking injury.

Dr. Gabaeff noted intracranial pressure can cause retinal hemorrhaging, so Nicholas's brain swelling could have caused his hemorrhaging. According to Dr. Gabaeff, the first X-ray to note a rib fracture was taken about 30 days after Nicholas was taken to the hospital. He opined the initial X-rays were normal, and the report noting a rib fracture in the first X-ray was an addendum made after the subsequent X-rays were taken. Thus, he concluded the initial finding of no fracture was more accurate.

Dr. Gabaeff admitted he misinterpreted a test as being consistent with a clot when the report actually stated there was normal blood flow. He also discounted the evidence of the rib fracture because it had occurred six to eight weeks prior. Therefore, he did not find it relevant. Dr. Gabaeff admitted meningitis does not cause rib fractures. He also noted he had never examined Nicholas.

John Tello is an attorney who was retained by defendant in April of 2010. He spoke to defendant on April 5 and, after an inquiry, informed him there were no current charges pending against him. He also had not located any outstanding warrants for defendant's arrest and relayed this information to defendant.

Yslas, 2014 WL 4923991, at *1–6.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor,

529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern

County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

and is therefore governed by its provisions.

B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule

that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

an "unreasonable application" of federal law is an objective test that turns on "whether it is

possible that fairminded jurists could disagree" that the state court decision meets the standards

set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

application of federal law is different from an incorrect application of federal law.'"  Cullen v.

Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert. denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.      Review of Claims

The instant petition presents the following grounds for relief: 1) The trial court committed error by allowing trial counsel to give an additional closing argument after jury deliberations had already begun; 2) The trial court abused its discretion in admitting Petitioner's confession/admission; 3) Defense counsel rendered ineffective assistance by failing to object to

9

supplemental closing argument, and by failing to object to the admission of Petitioner's

confession/admission; and 4) There was insufficient evidence to sustain the guilty verdict.

    1.    <u>Trial Court Error – Allowing Supplemental Closing Arguments</u>

Petitioner first alleges the trial court erred by allowing supplemental closing arguments

after the jury had begun deliberations.  Petitioner presented this claim on direct review.  The Fifth

DCA rejected the claim, as follows:

**I.    The Trial Court's Decision to Reopen Closing Arguments Did Not Constitute an Abuse of Discretion**

Defendant argues the trial court abused its discretion by allowing counsel to reargue portions of the case after deliberations had begun. To the extent defense counsel did not object to this procedure, he argues his counsel was ineffective. We conclude there was no error.

The jury began deliberations on May 3, 2012, at approximately 11:04 a.m. That afternoon, the jury requested readback of Leticia's and Dr. Massi's testimony. Later that same afternoon, the jury requested specific testimony from Dr. Massi relative to several exhibits admitted into evidence. The court explained it would be more time efficient to just have the court reporter read back all of Dr. Massi's testimony. Due to the hour, the court adjourned for the evening and explained the readback would begin in the morning.

The following afternoon, the jury sent the court a note asking, "What happens if we can't come to an agreement." The trial court discussed the matter with the parties, noting it appeared the jury was at an impasse. The court explained it proposed to respond to the jury consistent with California Rules of Court, rule 2.1036 [N.4] informing it of actions the court could take to assist it in reaching a verdict. The court also stated it would offer additional readback of testimony. When asked, the parties had no further input on the matter.

> [N.4] All further references to rules are to the California Rules of Court. Rule 2.1036 provides as follows:
> "(a) Determination
> "After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict.

When the jury returned to the courtroom, the court explained the court could offer several alternatives that might assist the jury. Those options included further readback of testimony, additional instructions on the law, clarification of previous instructions, or permitting the attorneys to make additional closing arguments. Regarding permitting additional arguments, the court explained:

> "And when we talk about permitting the attorneys to make additional closing arguments, it is probably not going to be helpful to the jury just to ask them to reargue the whole case. But if the jury in further deliberations

> identified specific subjects or issues that you feel it would assist you in hearing the attorneys make additional closing arguments on those narrower subjects or issues, then the Court may permit the attorneys to do that."

The court informed the jurors it could offer any of these measures or any combination of them if they thought it would be helpful. Before asking the jury to return to deliberate further and to discuss the options provided, the court noted:

> "Again, let me make it clear that I'm not pressuring you in any way. The Court is not trying to put any pressure on anyone to reach a certain verdict or reach a verdict. It is your duty to decide the case if you can do so based on the evidence and the law. [¶] ... [¶]

> "... With those thoughts in mind, I'll ask you to return to the jury room and continue deliberating, discuss among yourselves some of the things I've discussed with you to see if there is anything the Court might do to assist the jury agree."

Shortly after returning to deliberate further, the jury sent a note to the court stating:

> "Please explain the meaning of beyond reasonable doubt. Please explain timeline of rib fracture. Please explain timeline of brain swelling after injury? How long does it take for fontanal [sic ] swelling to happen after injury? How or what evidence do we have that explains when and where injury first occurred."

The trial court inquired of the jurors if they were asking for additional closing arguments on these issues. The foreperson stated that was what they were requesting. After a short sidebar, the court explained it would allow each attorney an opportunity for additional closing argument.

The court released the jurors for the day and then discussed with counsel the procedure for making the additional closing arguments. After delineating the procedure, the trial court asked the parties if they submitted on the procedure. Both agreed. The court explained its tentative ruling was to allow the parties to present their additional closing arguments, but that it would "limit ... the subjects or issues which are raised in the note by the jury so this is not a free ranging, reargue your entire case." When asked if either party would like to make any additional record, both parties replied "no."

Subsequently, both the prosecution and defense gave their additional closing arguments limited to the issues identified in the jury's note. Thirty minutes after the jury received the additional arguments, they returned with a guilty verdict.

Relying on *U.S. v. Evanston* (9th Cir. 2011) 651 F.3d 1080 (*Evanston*), defendant argues the trial court abused its discretion in allowing additional closing arguments on factual matters. We disagree. Although we are not bound by lower federal court decisions (*People v. Avena* (1996) 13 Cal.4th 394, 431; *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3), we nonetheless find *Evanston* distinguishable.

In *Evanston* the court addressed whether "a district court may, over defense objection and after the administration of an unsuccessful *Allen* [N.5] charge, inquire into the reasons for a trial jury's deadlock and then permit supplemental argument focused on those issues, where the issues in dispute are factual rather than legal." (*Evanston, supra*, 651 F.3d at p. 1082.) Ultimately, the court

"conclude[d] that allowing such a procedure in a criminal trial is an abuse of the discretion accorded district courts in the management of jury deliberations." (*Ibid.*)

> [N.5] "An *Allen* charge, the original concept of which was approved by the Supreme Court in *Allen v. United States* (1896) 164 U.S. 492, 501–502, is 'a supplemental instruction given by the court to encourage a jury to reach a verdict after that jury has been unable to agree after some period of deliberation.' [Citation.]" (*Evanston, supra*, 651 F.3d at p. 1082, fn. 1.)

In reaching this conclusion, the court focused upon several factors not present here. First, the court noted the dangers of impermissibly coercing a jury to reach a verdict. (*Evanston, supra*, 651 F.3d at pp. 1084–1085.) *Evanston* explained "[e]xtraordinary caution must be exercised when acting to break jury deadlock. This is particularly true with respect to the court's actions in giving an Allen charge, which we have recognized as already 'stand[ing] at the brink of impermissible coercion.'" (*Id.* at p. 1085.) Thus, the court noted "it is per se error to give a second *Allen* charge where the jury has not requested one, because it conveys a message that 'the jurors have acted contrary to the earlier instruction as that instruction was properly to be understood. ("Apparently you didn't listen to what I said before, so I'll repeat it."),' and that message serves no purpose other than impermissible coercion." (*Evanston, supra*, at p. 1085.) Here, unlike *Evanston*, the court never gave a prior deadlock instruction, and defense counsel never objected to the procedure used by the court.

Next, the court found the district court's allowance of supplemental arguments

> "intruded upon the jury's fact-finding role in two ways and through two conduits: (1) the judge's questioning as to the reasons for the deadlock required that the jury divulge the state of its unfinished deliberations, thereby violating the jury's deliberative secrecy, [citations]; and (2) the parties' supplemental arguments, coupled with the judge's insistence on continuing after a second deadlock, injected the court and the attorneys into the jury's deliberative process, thereby raising the specter of jury coercion." (*Evanston, supra*, 651 F.3d at pp. 1087–1088.)

The combination of allowing the supplemental factual argument, after the jury reported for a second time that it was at an impasse, increased the coercive value of the instruction, implying the judge did not believe the jury had "accorded proper deference to his prior encouragement to reach a verdict." (*Evanston, supra*, 651 F.3d at p. 1088.)

However, the court specifically noted it did not "foreclose the possibility that supplemental argument treating factual matters could ever be used"; rather, it found only that the manner in which it was used in that case "resulted in an impermissible intrusion into the jury's role as the sole fact-finder." (*Evanston, supra*, 651 F.3d at p. 1088.) Thus, *Evanston* does not stand for the proposition that allowing supplemental arguments on factual matters is per se error.

Furthermore, the *Evanston* court relied upon the fact that the practice of allowing supplemental argument on factual matters was not authorized by any current court rule. On the contrary, it seemed to run counter to the Ninth Circuit Model Jury Instructions. (*Evanston, supra*, 651 F.3d at pp. 1088–1089.) The court pointed out California was one of three states to "have adopted rules specifically allowing for additional or supplemental closing argument in criminal cases where juries indicate that they have reached an impasse in their deliberations." (*Id.* at p. 1089.)

Unlike the federal courts with no analogous rule, the states that adopted such a rule have had the "benefit of the formal rulemaking process to weigh the benefits and risks of allowing supplemental argument." (*Ibid.*) Thus, the fact California has specifically adopted a rule allowing for such argument is also a distinguishing factor.

Finally, in reaching its conclusion, the *Evanston* court clarified:

> "[W]e do not reach today the question of whether the use of supplemental arguments to address factual matters is necessarily or always an error of constitutional dimension, whatever the circumstances. Rather, we hold that, under the circumstances presented here, the district court's actions resulted in impermissible coercion, and consequently an abuse of discretion meriting reversal. We so limit our holding because the Supreme Court's precedent on similar jury coercion issues has generally emanated from its supervisory powers over the federal courts, rather than any mandate from the federal Constitution." (*Evanston, supra*, 651 F.3d at p. 1093, fn. 15.)

Because *Evanston* does not involve constitutional rules or principles that impact state courts, we decline to apply it here.

We find the present case much more analogous to *People v. Young* (2007) 156 Cal.App.4th 1165 (*Young*). There, during deliberations, the jury informed the court it was deadlocked regarding the issue of a lesser included offense. The court inquired whether additional argument from counsel would be helpful. Some jurors indicated it would be helpful. The court then reopened closing argument without objection from the parties. (*Id.* at p. 1169–1170.) On appeal, the defendant contended the court lacked authority to reopen closing arguments. Among his arguments, he claimed the process constituted impermissible jury coercion. (*Id.* at pp. 1170–1171.) Initially, *Young* held defense counsel's failure to object to the process forfeited the issue on review. (*Id.* at p. 1171.) However, the court went on to address whether the failure to object constituted ineffective assistance of counsel.

The court held it was proper to ask the jury if additional argument would be helpful and then to allow additional argument when, as here, no coercive instructions were given, the trial court did not indicate a preference for a particular result, and both sides were given an equal opportunity to argue. (*Young, supra*, 156 Cal.App.4th at pp. 1171–1172.) While being mindful that a court must act with caution so its actions will not be perceived as coercive, the court explained "when faced with questions from the jury, including that they have reached an impasse, 'a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.'" (*Ibid.*)

Because there were no remarks by the trial court that could have been considered coercive or as favoring a particular verdict, the jury indicated additional arguments would be helpful, and the procedure employed was neutral, the court found the procedure did not constitute an abuse of discretion. (*Young, supra*, 156 Cal.App.4th at p. 1172.) Thus, trial counsel could not be considered ineffective as the defendant did not demonstrate his counsel acted deficiently. (*Ibid.*)

Likewise, this court recently upheld a trial court's decision to permit additional argument pursuant to rule 2.1036(b) in *People v. Salazar* (2014) 227 Cal.App.4th 1078 (*Salazar*). In *Salazar*, this court rejected an argument that allowing additional closing arguments after the jury began deliberations violated the defendant's right

to due process. (*Id.* at p. 1084.) We explained the court has discretion in "choosing whether to resort to the tools provided [in rule 2.1036] and how to use those tools." (*Id.* at p. 1088.) Furthermore, we rejected the defendant's argument that limiting the parties arguments to certain topics was error. Instead we found the "limitation allowed the attorneys to focus on the issue troubling the jury, thus ensuring the attorneys an opportunity" to provide the jury with the needed assistance. (*Id.* at p. 1089.)

Like *Young* and *Salazar*, we conclude the trial court acted within its discretion in permitting the additional arguments. The jury indicated it was at an impasse, and the court simply informed it of several options, consistent with rule 2.1036(b), that were available. The court was very specific that it was not attempting to coerce the jury into reaching a particular, or any, verdict. Upon hearing the available options, the jury indicated additional arguments would be helpful. The court employed a neutral process allowing each side an opportunity to argue. Neither party objected to this process. Under these circumstances, we find no abuse of discretion. As such, any failure to object necessarily did not constitute ineffective assistance of counsel. (*Young, supra*, 156 Cal.App.4th at p. 1172.)

Yslas, 2014 WL 4923991, at *6–9.

a. Analysis

Petitioner relies on United States v. Evanston, 651 F.3d 1080 (9th Cir. 2011), in support of his claim. In Evanston, the Ninth Circuit held that the district court abused its discretion in permitting supplemental argument focused on factual issues dividing the jury. Id. However, Evanston has no application here. Evanston is a Ninth Circuit decision. In reviewing whether the state court's denial of relief was objectively unreasonable, the federal court looks to the holdings of the Supreme Court. Circuit cases cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific rule that [the Supreme Court] has not announced." Marshall v. Rogers, __ U.S. __, 133 S.Ct. 1446, 1450 (2013). The Supreme Court has never considered whether supplemental arguments in a criminal trial violate a defendant's constitutional rights. See Evanston, 651 F.3d at 1083 (whether a trial court may permit supplemental argument is "a case of first impression"). Therefore, Petitioner cannot demonstrate that the state court rejection was contrary to or an unreasonable application of Supreme Court authority, and the claim fails.

In addition, in finding supplemental argument to be improper, the Ninth Circuit limited its ruling to the facts of that case. The court did "not foreclose the possibility that supplemental argument treating factual matters could ever be used." Id. at 1088. Moreover, the Ninth Circuit did not address whether supplemental argument constituted impermissible coercion under the

14

1  Constitution; rather, it limited its holding to its supervisory authority over lower federal courts.

2  Id. at 1093 n. 15.

3      2.    Trial Court Error – Admission of Petitioner's Confession

4      Petitioner next claims the trial court erred by admitting his tape-recorded confession

5  despite Petitioner's invocation of his Miranda[2] rights during custodial interrogation.  Petitioner

6  presented this claim to the appellate court on direct review.  It was denied, as follows:

> Defendant contends the trial court erred in admitting his tape-recorded statement to the police. He argues the statement was admitted without proper foundation because "there was no evidence to establish that [defendant] had not been questioned by other law enforcement officers in violation of *Miranda* prior to the tape recorded statement." Additionally, after recounting the transcript of defendant's statement regarding the waiver of his rights, defendant contends his statement "was improperly admitted at his trial." We disagree.

> Initially we note defendant never objected to the admission of his tape-recorded statement at trial. Indeed, during the in limine motions, the trial court explained the prosecution sought to admit defendant's tape-recorded statements and the parties discussed the matter in chambers. Upon clarifying that the prosecution only sought to admit the portion of defendant's statement after he agreed to speak without an attorney present, the court inquired as to whether defense counsel had any objection. Defense counsel stated he would submit on the issue, noting only that he "may have an objection" to a few lines in the transcript but "[i]n general, I don't have any objection."

> Subsequently, the parties agreed they had met regarding the redactions to be made to defendant's statement, and the prosecutor would make those agreed redactions and provide a copy to defense counsel. Indeed, defense counsel noted the two had agreed on all redactions with the exception of one word. After further discussions, the parties agreed on the content of defendant's statement that would be admitted. During this discussion, defense counsel indicated defendant would be testifying in the case and could explain the use of some of his terminology on the recording. Ultimately, the redacted statement was introduced into evidence without objection.

> It is well settled that failure to object to the admission of evidence in the trial court forfeits the issue on review. (Evid.Code, § 353; *People v. Pearson* (2013) 56 Cal.4th 393, 438–439; *People v. Partida* (2005) 37 Cal.4th 428, 433–434.) Additionally, the party must specify the grounds of the objection in order to both allow the trial court to make an informed ruling and provide the proponent of the evidence an opportunity to cure any defect. (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)

>> "*Miranda*-based claims are governed by this rule. 'The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal.' (*People v. Milner* (1988) 45 Cal.3d 227, 236; *People v. Rogers* (1978) 21 Cal.3d 542, 548.)" (*People v. Mattson* (1990) 50 Cal.3d 826, 854, superseded by statute on other

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

grounds as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.)

Here not only did defense counsel fail to object to the foundation for the statement or to the admission of the statement itself, but affirmatively agreed on the statement that was admitted. He cannot now argue the introduction of the statement was error. (*People v. Mattson, supra*, 50 Cal.3d at p. 854; *People v. Rundle* (2008) 43 Cal.4th 76, 116, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [forfeiture doctrine applies to objections based on *Miranda* violations]; *In re Sakarias* (2005) 35 Cal.4th 140, 170–171 [*Miranda* claim not presented at trial barred on both direct appeal and habeas corpus]; *People v. Holt* (1997) 15 Cal.4th 619, 666–667 [*Miranda* claim forfeited for failing to object at trial]; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal"].)

Perhaps anticipating this ruling, defendant argues his trial counsel was ineffective for failing to object to the admission of his tape-recorded statement as lacking foundation because there was no evidence his statement was not the product of a prior statement in violation of *Miranda* and, additionally, because defendant in fact invoked his right to an attorney during questioning. We find these claims without merit.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, "'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant....'" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) Defense counsel's failure to object rarely establishes ineffective assistance. (*People v. Avena* (1996) 13 Cal.4th 394, 444–445.) "[W]hen the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate record discloses "'no conceivable tactical purpose'" for counsel's act or omission." (*People v. Lewis, supra*, at pp. 674–675; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 ["'"[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged [,] ... unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding"]; *People v. Ray* (1996) 13 Cal.4th 313, 349 ["In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].)

The ineffectiveness claim for failure to object to defendant's statement on the basis that it could have been the product of an earlier interrogation in violation of *Miranda* is without merit. Defendant bases this claim upon the fact there was some evidence in the record that he spoke to another officer before making his statement to Sloan. The record indicates defendant spoke to an officer at the Ridgecrest hospital sometime shortly after Nicholas was admitted there. He also may have given an additional statement when he returned home to gather his belongings prior to driving to the Loma Linda hospital. The contents of these statements were never introduced at trial. To the extent defendant argues these statements could

have been the product of a violation of *Miranda*, we note there was no evidence defendant was in custody when he gave these statements.

*Miranda* warnings are only required when a person is subjected to custodial interrogations. (*Miranda, supra*, 384 U.S. at p. 444.) A custodial interrogation occurs when a law enforcement officer questions a suspect after placing him or her under formal arrest, or restrains the suspect's freedom of movement to the degree associated with a formal arrest. (*California v. Beheler* (1983) 463 U.S. 1121, 1125.) No evidence in the record supports the premise defendant was ever in custody prior to his arrest. Nor is there any evidence defendant gave any other statement prior to receiving his *Miranda* rights. Of course, trial counsel has no duty to make futile or frivolous motions. (*People v. Memro* (1995) 11 Cal.4th 786, 834, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

Furthermore, when the "'"record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] ... unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.]" (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266.) On this record we cannot say counsel's failure to object constituted either deficient performance or was not the result of a reasoned tactical decision. Instead, it is quite likely no objection was made because defense counsel had no information defendant ever made any prior statements in violation of *Miranda*. (See *People v. Mendoza Tello, supra*, at pp. 266–267.)

Defendant further contends he invoked his right to an attorney during the interrogation, thus his subsequent statement was inadmissible. Defendant simply argues he invoked his rights and, therefore, his statement was inadmissible. He makes no attempt to demonstrate his subsequent statements did not amount to a reinitiation of discussions by defendant, even after this issue was raised by the People. When arguing defense counsel was ineffective, again defendant makes no attempt to demonstrate his statement was not actually admissible or the failure to object was the result of a reasoned tactical choice. Rather, he argues, without any substantive analysis, that the admission of the statement was prejudicial. Defendant's complete failure to cite the relevant law and argue the question presented may be deemed a waiver of these issues on appeal. (Rule 8.204(a)(1)(B); *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1562, fn. 5; see *Estate of Randall* (1924) 194 Cal. 725, 728–729.) Nevertheless, we will address this issue.

The law regarding the invocation of the right to counsel is well settled.

> "*Miranda v. Arizona, supra*, 384 U.S. 436, and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. [Citations.] 'If a suspect indicates "in any manner and at any stage of the process," prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated.' (*People v. Crittenden* (1994) 9 Cal.4th 83, 128, italics omitted, quoting *Miranda v. Arizona*, at pp. 444–445.) Once the right to counsel has been invoked, further questioning is forbidden until counsel has been provided, 'unless the suspect personally "initiates further communication, exchanges, or conversations" with the authorities.' [Citations.]

"""An accused 'initiates'" further communication, exchanges, or conversations of the requisite nature "when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.""" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 727.) "'[W]here reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.'" (*People v. Sims* (1993) 5 Cal.4th 405, 440[, overruled on other grounds as stated in *People v. Storm* (2002) 28 Cal.4th 1007, 1031]; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1311.) Thus, the People must show both that the defendant reinitiated discussions and that he knowingly and intelligently waived the right he had invoked. (*People v. Davis* [ (2009) ] 46 Cal.4th [539,] 596.) If instead the police reinitiate discussion without a break in custody, any further statements by the defendant are presumed involuntary and rendered inadmissible. (*McNeil v. Wisconsin* [ (1991) ] 501 U.S. [171,] 177; *People v. Storm* [, *supra*,] 28 Cal.4th [at pp.] 1021–1022.)" (*People v. Gamache* (2010) 48 Cal.4th 347, 384–385.)

It is true that after being advised of his right to an attorney by Detective Richard Smith of the Ridgecrest Police Department, defendant stated, "Yes, sir. I have an attorney right there," and when asked if he wanted to speak to the officers without an attorney present, defendant said "No." This was a clear invocation of his right to an attorney. However, it is equally clear that immediately thereafter defendant opened a conversation with the officers by specifically asking Sloan a question which encompassed a general discussion about his case.

Indeed, immediately after invoking his rights, Sloan attempted to ask defendant a question, when defendant cut him off and asked "Why you tryin' to fuck me, Ryan?" The question itself demonstrated defendant's desire to talk about the particulars of the case, as he asked why the officer was building a case against him. Sloan responded he was not doing anything to defendant when defendant again opened up a conversation about the case. Defendant stated the officer had "said a bunch of bad stuff about [him]" earlier. He clarified Sloan told defendant's friend that defendant was "a sinking ship." This again indicated defendant's wish to speak about the evidence in the case.

Although defendant had communicated his desire to speak with the officers after invoking his rights, the record must show defendant affirmatively waived his right to have an attorney present during the interview. (*People v. Gamache, supra*, 48 Cal.4th at pp. 384–385.) The record indicates that immediately after defendant made the above comment, Sloan told defendant, "you have rights and you just had told me you don't want to talk about it." Defendant replied that Smith had just asked if defendant wanted to talk. Thereafter, a short exchange took place regarding the severity of the charges, and defendant noted he spoke to his attorney that day about turning himself in. Sloan noted he was just doing his job and defendant again began speaking about the facts of the case, noting a social worker had called him, and he asked if Sloan had listened to any phone conversations. Once again Sloan indicated he was just doing his job and using the evidence he had when defendant pointed out there were two parents. Sloan replied defendant was the one who left, and then Smith interrupted and asked defendant if he wanted to speak with the officers without an attorney present as defendant had begun to go into the facts of the case.

18

Sloan followed up, noting defendant had invoked his right to an attorney, and the fact defendant was speaking to him about the case at that point would be "crossin' this line." Defendant responded by saying, "[C]an I say one more thing before we go any further then?" He noted he wanted to talk to the officers, but was hesitant. Defendant went on to say that he felt like he should have an attorney present, and Sloan responded, "We're at a ... wall. You have rights which he just read to you. [¶] ... [¶] ... And, you told us you do not wanna answer any questions or provide a statement without your attorney present. So ... so the ..." Defendant interrupted, stating, "[T]hat looks bad on me too," and asked the officer what he thought. Sloan replied it was a gray area, but it would "be out of line" for Sloan to ask defendant questions because he had asked for an attorney.

The officers reiterated defendant had rights, and it was solely his decision whether to talk to them, but they could not ask any more questions without his attorney present. Defendant asked the officers for advice, and they explained they were not his counsel and, again, they were "at a wall." Defendant asked if it was "still my choice to say yes or no," and after the officers indicated it was, and again reminding defendant that he had rights, Sloan asked, "Do you want to talk or do you not?" Defendant replied, "Yeah, I'll talk."

The totality of the above circumstances demonstrates defendant's decision to speak to the officer was not the result of coercion. (*People v. Gamache, supra* 48 Cal.4th at p. 386.) Indeed, it was defendant who cut off the officers and asked the initial question, and it was defendant who kept inquiring into the case even after the officers informed him repeatedly that he had invoked his right and they could not talk to him. The above exchange demonstrates that although defendant initially invoked his right to counsel, he thereafter indicated his desire to speak to the officers regarding the case without his attorney present. The officers repeatedly reminded defendant of his rights, and he expressly waived them. Furthermore, defendant was reminded of his rights throughout the remainder of the interview. On this record, we find defendant initiated the questioning after invoking his right to an attorney and subsequently was reminded of and waived his Miranda rights. Therefore, his statement was admissible and defense counsel's failure to object necessarily did not constitute ineffective assistance of counsel.

Furthermore, it appears from the record that defense counsel had an additional tactical reason for not objecting to the admission of defendant's statement. Notwithstanding the fact that counsel is not required to make futile or frivolous motions (*People v. Memro, supra*, 11 Cal.4th at p. 834), it appears defendant had decided to testify prior to trial. During the in limine motions, defense counsel made note of the fact defendant would be testifying on his own behalf. He did so at trial, providing testimony that was in accord with the statement he had provided to Detective Sloan. As the evidence at trial established defendant fled to Las Vegas after Nicholas was admitted to the Loma Linda hospital, it is likely defense counsel wanted defendant to explain why he fled. Indeed, during his testimony, defendant stated he left because he felt he would be accused even though he claimed he had never harmed Nicholas. Furthermore, in both his statement to Sloan and during his testimony, defendant denied ever harming Nicholas in any way. Defendant's testimony was consistent with his prior statement, and because the two were similar, the admission of his prior statement helped the defense by showing he gave a similar statement when questioned by police. Had defendant testified inconsistently with his prior statements, those statements would have been admissible as impeachment evidence even if they were obtained in violation of Miranda. (*Harris v. New York* (1971) 401 U.S. 222, 224–226; *People v. Demetrulias* (2006) 39 Cal.4th 1, 29–30.) Thus, it appears defense counsel had a

valid tactical basis for failing to object to the admission of defendant's statement. Yslas, 2014 WL 4923991, at *10–14.

        a.  Procedural Default

As an initial matter, Respondent contends that the claim is procedurally barred because no contemporaneous objection was made at trial. The Court agrees.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that California's contemporaneous objection doctrine is clear, well-established, and has been consistently applied when a party has failed to make any objection to the admission of evidence. In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the contemporaneous objection bar is an adequate and independent state procedural rule. In this case, Petitioner did not object to the general use of retrograde extrapolation as being unreliable or lacking in any scientific basis. Further, Petitioner has not demonstrated cause for the default or actual prejudice resulting therefrom. Thus, the claim is procedurally defaulted.

        b.  Legal Standard

The Fifth Amendment provides that "no person shall be compelled in any criminal case to

be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. Miranda v. Arizona, 384 U.S. 436, 469–73 (1966). In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469 U.S. 91, 98 (1984); see also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975); DeWeaver, 556 F.3d at 1001. A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 426 (1986). However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, 560 U.S. 370, 383 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1979). A valid waiver of rights may be implied under the circumstances presented in the particular case. Specifically, "a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir.2008) (quoting United States v. Rodriguez–Preciado, 399 F.3d 1118, 1127, *amended*, 416 F.3d 939 (9th Cir.2005)); see also Butler, 441 U.S. at 369-73 (waiver of Miranda rights can be inferred "from the actions and words of the person interrogated.").

     c.  Analysis

Even if counsel had objected at trial, the objection would have been futile insofar as there

21

was no violation of <u>Miranda</u>.  Petitioner argues that his confession given after he was read his <u>Miranda</u> warnings was a product of a prior statement taken in violation of <u>Miranda</u>.  However, as noted by Respondent, there are no facts in the record to show Petitioner was ever in custody prior to his arrest.  <u>Miranda</u> protections attach only after Petitioner has been placed in custody. <u>Miranda</u>, 384 U.S. at 444.  Therefore, this part of Petitioner's claim fails.

Petitioner also claims that the statements he provided after he was arrested and given his <u>Miranda</u> warnings violated his constitutional rights.  This claim is also without merit since Petitioner fails to show that the state court decision was objectively unreasonable.  As noted by the appellate court, Petitioner unequivocally invoked his right to counsel after he was read his <u>Miranda</u> warnings.  However, as reasonably found by the state court, Petitioner then immediately reinitiated a conversation with the officers and then expressly, knowingly, and intelligently waived his <u>Miranda</u> rights.  The record shows that immediately after he was read his rights, Petitioner asked Detective Sloan, "Why you tryin' to fuck me, Ryan?"  (LD 1 at 123-25.)  The officers repeatedly interrupted Petitioner to advise him that he had rights, and they could not discuss the matter further without counsel being present.  (LD 1 at 125-27.)  Petitioner then asked, "It's still my choice to say yes or no?"  (LD 1 at 127.)  Detective Smith told him, "Yes, absolutely," and Detective Sloan stated, "You have rights.  Attorneys are there for a reason.  Do you want to talk or do you not?" (LD 1 at 127.)  Petitioner replied, "Yeah, I'll talk . . . ." (LD 1 at 127.)  Given these facts, the state court reasonably found that Petitioner had reinitiated a discussion and then validly waived his <u>Miranda</u> rights.  Thus, there is no merit to the claim.

3.      <u>Ineffective Assistance of Counsel</u>

Petitioner claims that defense counsel was ineffective in failing to object to supplemental closing argument, and in failing to object to the admission of Petitioner's confession.  Petitioner raised this claim on direct review.  The Fifth DCA denied the claim as previously set forth.

a.      <u>Legal Standard</u>

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to <u>Strickland</u>'s two-pronged test.  <u>Miller v. Keeney</u>, 882 F.2d

1  1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also

2  Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or

3  constructively denied the assistance of counsel altogether, the Strickland standard does not apply

4  and prejudice is presumed; the implication is that Strickland does apply where counsel is present

5  but ineffective).

6        To prevail, Petitioner must show two things.  First, he must establish that counsel's

7  deficient performance fell below an objective standard of reasonableness under prevailing

8  professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

9  must establish that he suffered prejudice in that there was a reasonable probability that, but for

10  counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable

11  probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.

12  The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

13  by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

14        With the passage of the AEDPA, habeas relief may only be granted if the state-court

15  decision unreasonably applied this general Strickland standard for ineffective assistance.

16  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

17  federal court believes the state court's determination under the Strickland standard "was incorrect

18  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

19  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

20  is "doubly deferential" because it requires that it be shown not only that the state court

21  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

22  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

23  state court has even more latitude to reasonably determine that a defendant has not satisfied that

24  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

25  application was unreasonable requires considering the rule's specificity.  The more general the

26  rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

27        b.  Analysis

28        Petitioner's claims of ineffective assistance of counsel fail because he does not

demonstrate that counsel erred or that he suffered any prejudice. With respect to his claim that counsel failed to object to supplemental closing arguments, the procedure involved was specifically provided for in California Rules of Court Rule 2.1036. There was no Supreme Court authority which disallowed such procedure. The Ninth Circuit case of <u>Evanston</u> was not binding on the state court, and in any case, the Fifth DCA reasonably distinguished it from the instant case. Therefore, any objection by counsel would have been denied.

Petitioner also fails to show error or any resulting prejudice with respect to his claim that counsel failed to object to the admission of his confession. As discussed above in ground two, Petitioner's <u>Miranda</u> rights were not violated. There is no indication that he was ever in custody prior to his arrest. After he was arrested, he was given <u>Miranda</u> warnings, but he voluntarily and intelligently reinitiated discussion and waived his right to counsel. Any objection would have been denied. Accordingly, Petitioner's claims of ineffective assistance of counsel must be rejected.

4. <u>Insufficiency of the Evidence</u>

Last, Petitioner argues that the evidence to support the conviction was insufficient. This claim was also presented on direct appeal. In the last reasoned decision, the Fifth DCA stated as follows:

> Defendant claims the evidence was insufficient to support his conviction. Specifically, he argues the jury's request for clarification regarding the timeline for Nicholas's rib fractures, when the brain swelling began, and to delineate the evidence regarding when the injury occurred demonstrated the record was insufficient to support the conviction. He contends "there was absolutely no evidence upon which the jury could reach the conclusion beyond a reasonable doubt that the injuries to Nicholas occurred during that brief window of time." We disagree.
>
> Other than stating there was "no evidence" upon which the jury could conclude he was the cause of Nicholas's injuries, defendant does not detail in what manner the evidence was insufficient. Defendant does not cite any of the facts in his argument and provides only a cursory statement of facts in his opening brief. Indeed, his only citation to the record regarding the sufficiency of the evidence is the citation to the jury's question. His reply brief fails to shed any further light on the subject, arguing only "that the jury's note to the court outlining the areas upon which they were deadlocked leads to the inescapable conclusion that the evidence upon which the verdict was based was not substantial." Defendant's failure to outline how the evidence was insufficient to support the conviction permits the court to pass it without consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Nevertheless, we will address the issue below.

24

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review "the evidence in the light most favorable to the prosecution, [asking whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"Whether the evidence presented at trial is direct or circumstantial, ... the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Towler* (1982) 31 Cal.3d 105, 118–119.)

> "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citations.]" (*People v. Stanley, supra*, 10 Cal.4th at pp. 792–793.)

Defendant does not attack, or even recount, the elements of felony child abuse; rather, he argues the evidence was insufficient to demonstrate he inflicted the injury upon Nicholas. As only this limited issue has been raised by defendant, it is the only issue we will consider. After a thorough review of the evidence, we conclude the evidence was sufficient to support the jury's conclusion Nicholas was indeed injured while in the sole care of defendant.

By all accounts, Nicholas was well and behaving normally when Leticia left him with defendant on April 2. According to the evidence, Nicholas had been seen by his pediatrician two days earlier for a well-baby visit and had been provided with immunizations. Leticia noted Nicholas had been a little more fussy than usual due to his vaccinations but was otherwise acting normally. When Leticia left to go shopping, Nicholas was in his swing. Upon her return, the child was lying on defendant's chest, covered with a blanket. Within minutes of her return, defendant placed Nicholas in his crib.

The jury was presented with two possibilities regarding Nicholas's injuries. According to Dr. Massi, Nicholas suffered some sort of rapid

acceleration/deceleration event. He opined Nicholas suffered a trauma inflicted upon him by someone else, resulting in injuries to his brain. Specifically, the injuries were consistent with a rapid acceleration/deceleration that could occur when "an infant is either violently shaken or slammed repeatedly and the brain is moving within the skull at a different rate." Because Nicholas did not have any obvious signs of trauma, the doctor believed there was either some shaking of the child or other repetitive acceleration/deceleration. The injury manifests itself through a behavior change, as in this case where Nicholas experienced seizures prompting his trip to the emergency room. Additionally, he had bleeding within the brain and retinas. When the brain moves within the skull in this type of traumatic event, it ruptures blood vessels, causing the bleeding in the brain.

Further when there is retinal hemorrhage in multiple layers of the retina, it indicates there was a traumatic event causing the condition. Also, the portions of the brain injured indicated trauma. For example, a blow to the head could cause an injury to the area where the blow was delivered and possibly the area opposite the blow. A brain deprived of oxygen results in injury to the entire brain. The injuries here, where several different areas of the brain were affected, were consistent with trauma.

Nicholas's brain scan taken shortly after he was admitted to the emergency room showed the left half of his brain was bleeding and significantly swollen. Because of the extreme swelling, the doctors could not reattach a portion of his skull for a lengthy period. Nicholas's entire brain was damaged, with the most severe damage extending from the right frontal lobe to the back of the left parietal lobe. Nicholas would have had to have been exposed to an excessive level of force to produce these injuries.

Moreover, Nicholas had evidence of rib fractures. Although X-rays taken at the time he was admitted to the hospital did not clearly show a fracture, upon review the doctor opined there was a fracture present. Subsequent X-rays taken four weeks later showed healing, and such healing is evident on X-rays four to six weeks after an injury. This evidence supports the inference Nicholas suffered a rib fracture at the same time as the brain injury. Furthermore, Dr. Massi testified the type of fracture seen in Nicholas was consistent with a front-to-back compression injury. This in combination with the brain injury supports a reasonable inference that violent shaking caused the child's injuries.

Although there was no specific testimony as to the exact timeframe the injury occurred, one could infer from the totality of the evidence the injury occurred while Nicholas was in defendant's care. The evidence established Nicholas was well and acting normally prior to Leticia leaving him in defendant's care. When she returned, defendant had Nicholas on his chest and covered with a blanket. Within minutes of her return, defendant took the child to his crib and returned to watch a movie. At some point, Leticia heard Nicholas making noise and was going to get him, however, defendant dissuaded her from doing so. When Leticia heard Nicholas making noises for a second time, she went to check on him and found him obviously suffering from a major injury. According to the doctors, Nicholas was suffering severe seizures when he arrived at the hospital. The sudden change in the child's behavior just after he was alone with defendant, in combination with Dr. Massi's opinion that Nicholas suffered nonaccidental trauma, leads to the reasonable conclusion defendant was the cause of Nicholas's injuries.

Because Nicholas was clearly acting normally before Leticia left, but was obviously suffering from a serious injury when she returned, it is reasonable to

infer the traumatic event occurred during the time Nicholas was in defendant's care. Furthermore, the jury could consider defendant's behavior as consciousness of guilt. Defendant concealed the child from Leticia and initially dissuaded her from checking on him. Additionally, at the hospital, instead of inquiring into Nicholas's prospects of recovery or his condition, defendant's questions focused solely on the causation of his condition. Finally, while his son was in critical condition, defendant fled to Las Vegas after learning the doctors suspected child abuse, further demonstrating a consciousness of guilt.

Taken together, these facts were sufficient to allow the jury to reasonably infer defendant was the cause of Nicholas's injuries. Likewise, the jury was entitled to discount Dr. Gabaeff's testimony that Nicholas suffered from a case of bacterial meningitis and not trauma. Presented with two competing theories by two doctors, the jury was entitled to choose which expert opinion to believe. We are not entitled to second-guess that choice.

Yslas, 2014 WL 4923991, at *14–17.

a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

27

1    477 U.S. 436, 459 (1986).

2         In <u>Cavazos v. Smith</u>, 565 U.S. 1 (2011), the United States Supreme Court further

3    explained the highly deferential standard of review in habeas proceedings, by noting that <u>Jackson,</u>

4         makes clear that it is the responsibility of the jury - not the court - to decide what
          conclusions should be drawn from evidence admitted at trial. A reviewing court
5         may set aside the jury's verdict on the ground of insufficient evidence only if no
          rational trier of fact could have agreed with the jury. What is more, a federal court
6         may not overturn a state court decision rejecting a sufficiency of the evidence
          challenge simply because the federal court disagrees with the state court. The
7         federal court instead may do so only if the state court decision was "objectively
          unreasonable."
8
          Because rational people can sometimes disagree, the inevitable consequence of
9         this settled law is that judges will sometimes encounter convictions that they
          believe to be mistaken, but that they must nonetheless uphold.
10

11   <u>Id</u>. at 3-4.

12              b.   <u>Analysis</u>

13        In this case, there was substantial evidence from which a rational trier of fact could have

14   found Petitioner guilty beyond a reasonable doubt.  The evidence showed that Petitioner was

15   entrusted with the care of a child that was healthy and behaving normally.  When the mother

16   arrived home, the child was on Petitioner's chest covered with a blanket.  Petitioner immediately

17   placed the child in his crib.  When the mother initially wanted to check on the child, Petitioner

18   dissuaded her from doing so.  Eventually, she went to check on the child and discovered that he

19   was severely injured.

20        In addition, substantial medical evidence showed that the child had sustained traumatic

21   injuries to the ribs and to the brain consistent with violent shaking.  In addition to the medical

22   testimony, Petitioner exhibited a consciousness of guilt by asking strange questions concerning

23   causation of the injuries, and by fleeing the area.

24        In light of the state of the evidence, Petitioner fails to show that the state court rejection of

25   his claim was objectively unreasonable.  The claim must be denied.

26   **IV.    CERTIFICATE OF APPEALABILITY**

27        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

28   district court's denial of his petition, and an appeal is only allowed in certain circumstances.

28

Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

(a)    In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b)    There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability.  Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

## V.    ORDER

Accordingly, the Court **ORDERS**:

29

1    1) The Petition for Writ of Habeas Corpus is DENIED WITH PREJUDICE on the

2       merits;

3    2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

4    3) The Court DECLINES to issue a certificate of appealability.

5

IT IS SO ORDERED.

6

7    Dated:   **May 5, 2017**                              **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE

8